IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Travis Jamaal Robinson, | C/A No.: 0:23-5351-SAL-SVH |
| Plaintiff, | |
| vs. | REPORT AND RECOMMENDATION |
| Christopher Prinz, Police Officer, | |
| Defendant. | |

Travis Jamaal Robinson ("Plaintiff"), proceeding pro se and in forma pauperis, filed this action pursuant to 42 U.S.C. § 1983, alleging his constitutional rights were violated when he was arrested by Christopher Prinz ("Defendant") on February 19, 2022. Defendant seeks dismissal of Plaintiff's claim against him for excessive force.[1]

This matter is before the court on Defendant's motion for summary judgment. [ECF No. 47]. Pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the court advised Plaintiff of the dismissal procedures and the possible consequences if he failed to respond adequately to Defendants' motion. [ECF No. 51]. The motion having been fully briefed [ECF No. 58], it is ripe for disposition.

---

[1] The court has previously dismissed all other claims asserted against Defendant and all other claims asserted against previously named-defendant Rock Hill Police Department. [*See* ECF Nos. 11, 32, 36, 41].

All pretrial proceedings in this case were referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2)(f) (D.S.C.). For the following reasons, the undersigned recommends the district judge grant Defendant's motion for summary judgment.

I.  Factual Background[2]

On the evening of February 19, 2022, Defendant, a police officer employed by the City of Rock Hill, responded to a motor vehicle accident that had just occurred in Rock Hill, South Carolina, at a busy intersection on Cherry Road where exit and entrance ramps connect to Interstate 77. [ECF No. 47-2 ¶¶ 2, 4]. Defendant wore a camera on the front of his uniform ("BWC") that began recording shortly before he initiated his vehicle's blue lights to respond to the accident. *Id.* ¶ 3. As Defendant assisted with the accident, other officers responded, including Officer Emma Orr ("Orr"). [ECF No. 47-3 ¶ 3].[3]

---

[2] As a general rule, when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324; Fed. R. Civ. P. 56(c). In this Circuit, verified complaints by plaintiffs proceeding pro se are to be considered as affidavits when the allegations contained therein are based on personal knowledge. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). However, neither Plaintiff's complaint nor his response to Defendant's motion for summary judgment is verified, and Plaintiff has failed to otherwise proffer any evidence. [*See* ECF Nos. 1, 58].

[3] Because Orr responded to help with the motor vehicle accident that Defendant already investigated, the camera that she wore did not record and was covered by her traffic vest. [ECF No. 47-3 ¶ 7].

Defendant and Orr wore similar police uniforms, including dark pants, a duty belt holding a gun, ammunition, handcuffs, and other supplies, and a dark shirt with a Rock Hill Police identification badge embroidered with bright gold on both sleeves. [ECF No. 47-2 ¶ 12, ECF No. 47-3 ¶ 5]. Defendant's police badge was visible at the top left of his uniform shirt, and Orr wore a bright yellow vest with "POLICE" written in black letters on the front and back of the vest over her uniform. [ECF No. 47-2 ¶ 12, ECF No. 47-3 ¶ 5]. Defendant and Orr managed the scene of the accident and directed traffic in part of the intersection, which was well lit because of streetlights and vehicle lights. [ECF No. 47-3 ¶ 3, ECF No. 47-2 ¶ 4].

The court's review of Defendant's BWC evidence shows that after approximately twenty minutes at the accident scene, Defendant looked across the intersection and noticed a car stopped on the I-77 exit ramp. [*See* ECF No. 47-2]. Smoke rose from the hood of the car, and other vehicles descending the exit ramp began maneuvering around it. *Id.* Defendant states:

> I noticed Plaintiff stand by the driver's side door of his car. He was wearing jeans, a dark shirt or jacket, and a white hat. I saw him reenter the driver's side door and reemerge, holding a black backpack. Plaintiff then closed the driver's side door and walked around the front of his vehicle to the passenger side of the vehicle. I began crossing Cherry Road to assist him. Plaintiff started to walk away from the passenger side of his car, leaving the car in the exit ramp.
>
> At that point, I had almost finished crossing Cherry Road and called to him to "hold up." Approximately the same time that I

3

> called to him, he turned and looked at me; he then began running. His white hat fell off during his flight.
>
> I called out to Plaintiff several times to stop. He kept running, going near some bushes, and items fell from his backpack. Plaintiff then crossed Cherry Road, a very busy road in Rock Hill. He apparently tripped or ran into a vehicle and fell to the ground on the other side of the road.
>
> Plaintiff began to get up, but I caught up to him and brought him back to the ground before he could continue to flee or potentially fight me. Under the circumstances, this force was necessary, and I could not use any less force to contain Plaintiff.

[ECF No. 47-2 ¶¶ 5–8 (citations omitted), *see also id.* ¶ 4 (Defendant's BWC evidence)]. The events occurred quickly, with approximately 40 seconds elapsing between Defendant's crossing the street to investigate the smoking car and his tackling Plaintiff. *See id.* ¶ 4 (Defendant's BWC evidence).

Once Defendant was on the ground with Plaintiff, he tried to turn Plaintiff onto his stomach as Plaintiff "immediately began reaching toward his waistline and resisting." *Id.* at ¶ 9, *see also id.* ¶ 4 (Defendant's BWC evidence). Defendant offers evidence that after Plaintiff was on his stomach, he continued attempting to reach, but Defendant secured his arms, and Orr, who arrived soon after, helped secure Plaintiff's right arm. [ECF No. 47-3 ¶ 6, *see also id.* ¶ 4 (Defendant's BWC evidence)].

While Orr attempted to handcuff Plaintiff's right hand, Officer Jonathan Clements ("Clements") arrived and helped finish handcuffing Plaintiff. [ECF

4

No. 47-¶ 6, ECF No. 47-2 ¶ 9, *see also* ECF No. 47-4 (Clements' BWC evidence)].[4]

Once Plaintiff was handcuffed, Defendant felt the cuffs to see if they were too tight. [ECF No. 47-2 ¶ 4 (Defendant's BWC evidence)]. He then loosened the cuffs. *Id.* Defendant and Clements helped Plaintiff to a standing position and walked him to Clements' vehicle. *Id.* Plaintiff was able to stand, walk, and talk without any apparent difficulty. *Id.* As he walked to the vehicle, Plaintiff admitted that he had something illegal on his person, and Clements searched him before placing him in his vehicle. *Id.* In addition to some illegal drugs, Clements found an empty gun holster on Plaintiff's belt and a pistol that had fallen down Plaintiff's pant leg. [ECF No. 47-2 ¶ 4 (Defendant's BWC evidence), ECF No. 47-4 (Clements' BWC evidence)].

Sergeant Daniel Burkhart ("Burkhart") arrived shortly thereafter and spoke with Plaintiff. [ECF No. 47-5 (Burkhart's BWC evidence)]. Plaintiff stated that he ran because he was driving without a valid license. *Id.*

Defendant subsequently transferred Plaintiff to his vehicle for transport to jail. [ECF No. 47-2 ¶ 4 (Defendant's BWC evidence)]. During the ride to jail,

---

[4] Although Plaintiff argues without supporting evidence otherwise [ECF No. 58 at 2], there is no indication, including from Defendant's or Clements' BWC, that any police officer used or threw a can of pepper spray on Plaintiff, threatened Plaintiff with the use of pepper spray, or even had pepper spray in their possession. [*See* ECF No. 47-2 ¶ 4 (Defendant's BWC evidence), ECF No. 47-4 (Clements' BWC evidence)].

Plaintiff yelled and appeared to vomit, prompting Defendant to call for an ambulance to meet him at the jail. *Id.*[5] After Defendant made the call, Plaintiff talked normally with Defendant during the ride. *Id.* Once at the jail, Plaintiff did not want to turn his legs to exit the vehicle, saying that "[i]t's [his] back," which he claimed was "locked" from riding his dirt bike in the cold. *Id.*

When paramedics arrived, Plaintiff stood without any assistance. *Id.* When paramedics asked if he hurt anywhere, Plaintiff said, "everywhere." *Id.* Paramedics noted that his "vital signs all look good" and that while his heart rate was "up a little bit," it was "not too bad." *Id.* Plaintiff was taken inside to be booked shortly thereafter. *Id.*[6]

The Public Index shows that Plaintiff was arrested on two counts of possession of narcotics under indictments 2022GS4601093 and 2022GS4601094 and a weapons charge under indictment 2022GS4601095. *See* Public Index for the York County Clerk of Court Office (https://publicindex.sccourts.org/York/PublicIndex/PISearch.aspx, last visited

---

[5] Defendant was able to observe Plaintiff while driving to the jail via a camera installed in Defendant's vehicle and a monitor facing Defendant. [ECF No. 47-2 ¶ 4 (Defendant's BWC evidence)].

[6] Although Plaintiff argues without supporting evidence that he was struck with a can of pepper spray on his right temple, that his back hurts, and that "like a car accident the pain came later," [ECF No. 1 at 6, ECF No. 58], there is no indication from Defendant's body camera evidence that Plaintiff sustained an injury to his right temple or otherwise sustained any injury as a result of his interaction with Defendant or other officers on the day in question. [*See* ECF No. 47-2 ¶ 4 (Defendant's BWC evidence)].

on October 17, 2024).[7] On February 2, 2024, Plaintiff pled guilty to the weapons charge in 2022GS4601095 for "0044-Weapons / Unlawful carrying of pistol " and the narcotics charge in 2022GS4601093 for "0184-Drugs / MDP, Narcotic drugs in Sch. I(b) & (c), LSD, and Sched. II-2nd offense." *Id.* Plaintiff states in briefing he has "taken a plea for 8 yrs." [ECF No. 26]. He is currently serving his sentence relating to the charges. *See* S.C. Dep't Corrections Inmate Search, https://public.doc.state.sc.us/scdc-public/ (last visited on Oct. 17, 2024).

II.  Discussion

    A.  Standard on Motion for Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents,

---

[7] This court takes judicial notice of Plaintiff's criminal cases. *See Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) ("We note that 'the most frequent use of judicial notice is in noticing the content of court records.'").

7

electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Further, while the federal court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, *see, e.g., Cruz v. Beto*, 405 U.S. 319 (1972), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts that set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact when none exists. *Weller v. Dep't of Soc. Servs. for City of Baltimore*, 901 F.2d 387, 398 (4th Cir. 1990).

C. Analysis

The court analyzes claims of excessive force by law enforcement in the course of an arrest under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). Determining whether the force used to carry out a particular arrest is "unreasonable" under the Fourth Amendment requires "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985). The outcome of this balancing test necessarily depends on the facts and circumstances of the particular case. *Id.* at 8–9 (holding question is "whether the totality of the circumstances justifie[s] a particular sort of search or seizure"). The court considers factors including the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. Further, the analysis "must embody allowances for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation." *Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009) (citation omitted); *see also Jones v. Buchanan*, 325 F.3d 520, 530–31 (4th Cir. 2003) (holding the extent of injuries to the plaintiff "is another consideration

9

in determining whether force was excessive").[8]

Additionally, under the qualified immunity defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity ensures that "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Whether an officer is entitled to qualified immunity is a question of law for the court and, when there are no relevant disputed material facts, a court should rule on the qualified immunity issue at the summary judgment stage. *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005) ("Ordinarily, the question of qualified immunity should be decided at the summary judgment stage.").

To resolve a qualified immunity defense, the court must (1) determine

---

[8] As directed by the Fourth Circuit, "[i]n this Circuit, we've also considered a fourth factor: "the extent of the plaintiff's injuries." *Caraway v. City of Pineville*, 111 F.4th 369, 382 (4th Cir. 2024) (citing *Nazario v. Gutierrez*, 103 F.4th 213, 234 (4th Cir. 2024)). Here, Plaintiff has submitted no evidence in support of any injuries, and although the record indicates Plaintiff claimed he did not feel well, as evidenced by him possibly vomiting in the police car and EMS finding his heart rate was elevated, there is no evidence that Plaintiff was injured because of his interaction with Defendant or other officers. [*See* ECF No. 47-2 ¶ 4 (Defendant's BWC evidence), ECF No. 47-4 (Clements' BWC evidence, with Plaintiff exclaiming that he feels badly and spitting)].

whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right, and (2) determine whether the right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts may address the two prongs of the qualified immunity analysis in whichever order is appropriate in light of the circumstances of the particular case at hand. *Id.*

As Defendant argues, this case is like *United States v. Dykes*, 406 F.3d 717, 718 (D.C. Cir. 2005). Although not binding precedent, the court finds *Dykes* instructive. In *Dykes*, police officers pulled into a parking lot after responding to complaints of illegal drug trafficking in the area, officers were clearly identified, the plaintiff saw the officers and ran, and one officer forced the plaintiff to the ground, pulling the plaintiff's hands from beneath his body to handcuff him. *See id.*

> The *Dykes* court held:
>
> Here, the officers used force in two ways, each of which was reasonable. First, because Dykes was in full flight from officers who were justified in stopping him, tackling him was a reasonable method of effectuating the stop. *See United States v. Laing*, 889 F.2d 281, 283, 286 (D.C.Cir.1989) (holding that it was reasonable for police to force to the floor a suspect who began running upon seeing them). Second, once they had brought him to the ground, it was also reasonable for the officers to remove Dykes' hands from underneath his body and to place him in handcuffs. Dykes had kept his hands near his waistband, resisting both the officers' commands and their physical efforts to move his hands into plain view. Under these circumstances, it was reasonable for the officers to fear that Dykes had a weapon in his waistband, and to take the

11

necessary steps to ensure that he could not use it.

*Id.* at 720 (footnotes omitted); *see also id.* at 720 n.2 (collecting cases from the Third, Eleventh, Eighth, and Seventh Circuits upholding *Terry* stops effectuated by a tackle).

The court finds the first *Graham* factor weighs in Plaintiff's favor where officers had no reason to believe he had committed a crime when Defendant tackled him, aside from his flight from an apparently-disabled car parked on the interstate ramp. However, the other factors weigh in Defendant's favor, particularly the third factor where Plaintiff was both actively resisting arrest and evading seizure by flight. *See, e.g., Paylor v. D.C.*, C/A No. 22-3359 (JEB), 2024 WL 1050336, at *9 (D.D.C. Mar. 11, 2024) (collecting cases and noting "flight and resistance to arrest are generally considered a sufficient basis for a takedown, even in cases involving minor crimes, investigative stops, and people who did not pose a serious threat").

Accordingly, the undersigned recommends the district judge dismiss Plaintiff's claim asserting excessive force.[9]

---

[9] To the extent that Plaintiff argues Defendant lacked reasonable suspicion to detain him [ECF No. 58], the record indicates that Defendant had a "reasonable, articulable suspicion that criminal activity was afoot" when he saw Plaintiff retrieve his backpack from his stalled car and walk away from the uniformed, well-identified officers helping at another accident across the intersection, look back at Defendant when Defendant called for him to "hold up," run toward bushes and allow items to fall from his backpack before crossing the street, and ignore Defendant's commands to stop running. *Illinois*

III.   Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends the district judge grant Defendants' motion for summary judgment. [ECF No. 47].

IT IS SO RECOMMENDED.

October 17, 2024                                   Shiva V. Hodges
Columbia, South Carolina                     United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

---

v. Wardlaw, 528 U.S. 119, 123, 124 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion. . . ."); United States v. Frazer, 98 F.4th 102, 111–12 (4th Cir. 2024) (holding suspect's "headlong run" at mere arrival of police officers indicated criminal wrongdoing, as did his refusal to heed officer's commands to stop during flight); United States v. Wallace, 495 F. App'x 345, 346 (4th Cir. 2012) (holding that officers had reasonable suspicion to believe suspect was engaged in criminal conduct "when they tackled him following his flight from another officer who was in plain clothes and an unmarked vehicle.") (internal quotations marks omitted)).

13

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> 901 Richland Street
> Columbia, South Carolina 29201

Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).